# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

JENNIFER NOWAK,

    **Plaintiff,**

    **v.**                                  **Case No. 20-CV-1088-SCD**

ANDREW M. SAUL,
**Commissioner of Social Security,**

    **Defendant.**

---

## DECISION AND ORDER

---

Jennifer Nowak applied for Social Security benefits in 2017, alleging that she is disabled based on various physical impairments, including migraine headaches. Following a hearing in 2019, an administrative law judge denied benefits, finding that Nowak remained capable of working notwithstanding her impairments. Nowak now seeks judicial review of that decision, arguing that the ALJ erred in evaluating her migraine headaches. Because I agree that substantial evidence does not support the ALJ's decision, I will remand the case for further proceedings.

## BACKGROUND

Nowak was born on June 15, 1970. R. 60.[1] As a teenager, she developed frequent headaches that never went away. R. 676. She graduated high school and completed some college, but it's unclear what she did for work until 2003, when she started working as a customer service rep in a bank call center. R. 226, 236. Nowak was let go in December 2006

---

[1] The transcript is filed on the docket at ECF No. 13-2 to ECF No. 13-17.

when the bank downsized, but she was not unemployed for long. R. 62–63, 226. A few months later she started performing data entry for a nonprofit. R. 61, 226. In 2013, Nowak was diagnosed with fibromyalgia, which manifested in generalized muscle pain and chronic joint pain. R. 884. An upper respiratory infection in February 2017 resulted in an intractable cough that became so intolerable that Nowak stopped working altogether on March 20, 2017. R. 61–62, 235, 733. She hasn't worked since then; she supports herself with long-term disability benefits, which total $1,360 per month. R. 63, 67.

In August 2017, Nowak applied for disability insurance benefits from the Social Security Administration (SSA), alleging that she became disabled on March 20, 2017 (her last day of work), when she was forty-six years old. R. 197–98. Nowak asserted that she was unable to work due to "cough variant asthma," fibromyalgia, and migraines. R. 235. After her application was denied at the state-agency level, R. 85–108, Nowak requested an administrative hearing before an ALJ, R. 196. Nowak, along with her attorney, appeared via video before ALJ William M. Spalo on May 15, 2019. R. 41–84.

The ALJ first heard testimony from Dr. ChukwuEmeka Ezike, a medical expert. *See* R. 49–59. Dr. Ezike testified that, since her alleged onset date, Nowak has suffered from five medically determinable impairments: fibromyalgia, migraine headaches, Chiari malformation (structural defects in the base of the skull), chronic cough, and obesity. R. 49–50. According to Dr. Ezike, those impairments, individually and in combination, did not meet or medically equal the severity of any impairment that the SSA considers presumptively disabling. R. 51–52. When asked specifically if Nowak's migraine headaches were medically equivalent to a listed impairment, Dr. Ezike responded, "No, but I do look at central nervous system in 11.00 and I didn't see any equivalent." R. 53, 55–56.

2

Dr. Ezike then described, in his expert opinion, Nowak's functional limitations since her alleged onset date. R. 52. He stated that Nowak could lift ten pounds; sit for six hours with normal breaks; push/pull ten pounds; occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds; and occasionally bend, squat, kneel, sit, and crawl. R. 53–54. He also stated that, to accommodate her sensitivity to light and sound, Nowak should avoid concentrated exposure to loud noises and flashing/flickering lights, and that she should avoid concentrated exposure to vibration on account of her fibromyalgia. R. 54–56. After being informed about recent records indicating that Nowak uses an inhaler and a CPAP machine, Dr. Ezike added that she should avoid more than moderate concentration of pulmonary irritants and dust. R. 56–57. The ALJ then asked whether Nowak's migraines would result "in any limitation as far as like being around hazards of dangerous machinery or unprotected heights." R. 57. Dr. Ezike responded, "It is possible, your honor, and I can say no unprotected heights [or] machinery." *Id.* Finally, when asked whether Nowak's headaches would require her to need time off from work more than one day per month, he stated that "it is possible, but there is no way, again, for me to assess that." *Id.* at 58.

Nowak testified next. *See* R. 59–78. When asked why she believes she's unable to work, Nowak stated,

> Because I'm exhausted all the time, I mean, and exhausted sounds so small. It's you wake up, you're just feeling awful all day long. I said it's like the flu. I have low-grade fevers. I lose my voice. I'm constantly achy, it's either throbbing or stabbing or burning. Walking is difficult and I can't—I believe I have like social anxiety. I mean, I've never seen anyone, but—

R. 77. Nowak indicated that she has "migraines more than probably half the month and I just need to lay down and be in a dark room, quiet and it makes me nauseous." R. 64. She said she tried Botox injections, but "that did nothing." R. 64. She also took daily "rescue meds,"

3

which made her tired but didn't help her symptoms. R. 64–65. Nowak indicated that she has sought emergency-room treatment for her headaches in the past. R. 66.

As for her daily activities, Nowak testified that she drives, goes grocery shopping twice a month, cooks simple meals, loads the dishwasher, does some household cleaning, does laundry twice a month, feeds her dog and two cats, and watches TV. R. 68–70. She stated that she lost a lot of friends because she's unable to do much. R. 71. She also stated that she used to read a lot, but she can't anymore because she'll either get a headache or fall asleep. R. 71–72. When asked to describe a typical day, Nowak responded that she gets up late in the morning, sometimes showers (depending on how she feels), lies down after showering, eats breakfast, lets out her dog, watches TV, eats lunch, hangs out with her girlfriend watching TV, eats dinner, watches more TV, and goes to bed around 11:00 p.m. R. 72–73.

Finally, the ALJ heard testimony from Judith Parker, a vocational expert. *See* R. 78–83. Parker testified that Nowak had past relevant jobs as a data entry clerk (a semi-skilled job performed at the sedentary exertional level) and a loan clerk (also semi-skilled and sedentary). R. 79–80. According to Parker, a hypothetical person with Nowak's age, education, and work experience could perform both of those jobs if she had the limitations described by Dr. Ezike. R. 80–81. Parker stated that such an individual could also perform other sedentary jobs such as a telephone quotation clerk, a document preparer, and an ink printer. R. 81. Parker testified that all work would be precluded if the person had to miss more than four days of work each month on a regular basis. R. 81–82.

Applying the standard five-step process, *see* 20 C.F.R. § 404.1520(a)(4), on June 27, 2019, the ALJ issued a written decision concluding that Nowak was not disabled. *See* R. 21–40. The ALJ determined at step one that Nowak had not engaged in substantial gainful

4

activity since March 20, 2017, her alleged onset date. R. 26. At steps two and three, the ALJ found that Nowak's severe impairments—history of fibromyalgia, Chiari malformation, chronic migraine headaches, and obesity—limited her ability to work but didn't meet or equal the severity of a presumptively disabling impairment. R. 26–28. With respect to migraines, the ALJ determined that Nowak's "impairments do not meet listing 11.02 for epilepsy because the record does not show seizures occurring with the frequency described in the listing despite adherence to prescribed treatment." R. 27.

The ALJ next assessed Nowak's residual functional capacity—that is, the most she could do despite her limitations, *see* 20 C.F.R. § 404.1545(a). The ALJ determined that Nowak had the RFC to perform less than the full range of sedentary work. R. 28. To account for Nowak's migraine headache symptoms and Chiari malformation, the ALJ found that Nowak should "avoid concentrated exposure to . . . strobing/flashing light, loud noise, and vibration [and] . . . all exposure to dangerous moving machinery and unprotected heights." R. 28, 30. In assessing this RFC, the ALJ did not fully credit Nowak's subjective allegations of disabling symptoms. R. 31. As for the opinion evidence, the ALJ found persuasive the opinions of Dr. Ezike but did not find persuasive the opinions of the non-examining state-agency consultants or the notes of Nowak's treating providers. R. 31–32.

At step four, the ALJ determined that, considering her age, education, work experience, and RFC, Nowak could perform her past jobs as a data entry clerk and a loan clerk. R. 32–33. The ALJ alternatively determined at step five that there were a significant number of other jobs Nowak could perform, including, for example, a telephone quotation clerk, a document preparer, and an ink printer. R. 33–34. Based on those findings, the ALJ

5

determined that Nowak was not disabled from March 20, 2017, through the date of the decision. R. 34.

Thereafter, the SSA's Appeals Council denied Nowak's request for review, *see* R. 1–6, 195–96, making the ALJ's decision the final decision of the Commissioner of Social Security, *see Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016). On July 16, 2020, Nowak filed this action seeking judicial review of the Commissioner's decision under 42 U.S.C. § 405(g). *See* ECF No. 1. The matter was reassigned to me in August 2020 after all parties consented to magistrate-judge jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 4, 6, 7. The matter is fully briefed and ready for disposition. *See* ECF Nos. 14, 18, 19.

## APPLICABLE LEGAL STANDARDS

"Judicial review of Administration decisions under the Social Security Act is governed by 42 U.S.C. § 405(g)." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010)). Pursuant to sentence four of § 405(g), federal courts have the power to affirm, reverse, or modify the Commissioner's decision, with or without remanding the matter for a rehearing.

Section 205(g) of the Act limits the scope of judicial review of the Commissioner's final decision. *See* § 405(g). As such, the Commissioner's findings of fact shall be conclusive if they are supported by "substantial evidence." *See* § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)) (other citations omitted). The ALJ's decision must be affirmed if it is supported by substantial evidence, "even if an alternative position is also supported by

6

substantial evidence." *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) (citing *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992)).

Conversely, the ALJ's decision must be reversed "[i]f the evidence does not support the conclusion," *Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014) (citing *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003)), and reviewing courts must remand "[a] decision that lacks adequate discussion of the issues," *Moore*, 743 F.3d at 1121 (citations omitted). Reversal also is warranted "if the ALJ committed an error of law or if the ALJ based the decision on serious factual mistakes or omissions," regardless of whether the decision is otherwise supported by substantial evidence. *Beardsley*, 758 F.3d at 837 (citations omitted). An ALJ commits an error of law if his decision "fails to comply with the Commissioner's regulations and rulings." *Brown v. Barnhart*, 298 F. Supp. 2d 773, 779 (E.D. Wis. 2004) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir. 1991)). Reversal is not required, however, if the error is harmless. *See, e.g.*, *Farrell v. Astrue*, 692 F.3d 767, 773 (7th Cir. 2012); *see also Keys v. Barnhart*, 347 F.3d 990, 994–95 (7th Cir. 2003) (citations omitted).

In reviewing the record, this court "may not re-weigh the evidence or substitute its judgment for that of the ALJ." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)). Rather, reviewing courts must determine whether the ALJ built an "accurate and logical bridge between the evidence and the result to afford the claimant meaningful judicial review of the administrative findings." *Beardsley*, 758 F.3d at 837 (citing *Blakes*, 331 F.3d at 569; *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001)). Judicial review is limited to the rationales offered by the ALJ. *See Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95

(1943); *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**ANALYSIS**

Nowak contends that the ALJ committed three errors in his decision: (1) evaluating the severity of her migraine headache impairment at step three of the sequential evaluation process; (2) discounting Nowak's allegations of disabling migraine symptoms; and (3) failing to incorporate certain limitations stemming from Nowak's migraines in the RFC assessment.

## I. The ALJ's Step-Three Evaluation of Nowak's Migraine Headaches

"At step three, the ALJ must determine whether the claimant's impairments are 'severe enough' to be presumptively disabling—that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary." *Jeske v. Saul*, 955 F.3d 583, 588 (7th Cir. 2020) (citing 20 C.F.R. § 404.1525(a)). "An impairment is presumptively disabling if it is listed in the relevant regulations' appendix, *see* 20 C.F.R. § 404.1525(a), or if it is 'medically equivalent' to a listing, *id.* § 404.1526(a)." *Jeske*, 955 F.3d at 588. "When evaluating whether an impairment is presumptively disabling under a listing, the ALJ 'must discuss the listing by name and offer more than a perfunctory analysis of the listing.'" *Id.* (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)).

Because there is no specific listing for primary headache disorder, the ALJ here considered Nowak's migraine headache impairment under listing 11.02 (related to epilepsy), the most analogous listing for evaluating headaches according to SSA guidance. *See Snow v. Berryhill*, No. 3:18-CV-434 JD, 2019 U.S. Dist. LEXIS 71368, at *9 (N.D. Ind. Apr. 16, 2019) ("While no specific Listing for migraines exists, the Commissioner 'routinely considers [this] impairment[ ] under the criteria for the Listing [for epilepsy],' which is now 11.02.") (quoting

8

*Horner v. Berryhill*, No. 17 C 7586, 2018 U.S. Dist. LEXIS 138660, at *4 n.1 (N.D. Ill. Aug. 16, 2018)). Specifically, the ALJ determined that "[Nowak's] impairments do not meet listing 11.02 for epilepsy because the record does not show seizures occurring with the frequency described in the listing despite adherence to prescribed treatment." R. 27.

Nowak argues that the ALJ's step-three evaluation of her migraine headache impairment was deficient because he considered only whether Nowak's migraines *met* listing 11.02 and not whether her migraines *medically equaled* that listing. *See* ECF No. 14 at 10–14.[2] I disagree. The ALJ began his step-three analysis by broadly concluding that "the severity of [Nowak's] physical impairments, considered singly and in combination, *do not meet or medically equal the criteria of any listed impairment*." R. 27 (emphasis added). The ALJ explained,

> This finding is supported by the testimony of the medical expert at the hearing, Dr. Ezike, who said that he was familiar with the medical listings of the Commissioner and that based upon his experience, education, and training, and his review of the medical evidence, the claimant's medical impairments did not meet or medically equal the listings.

*Id.* The ALJ noted that Dr. Ezike "said that he considered listings in section 1.00, 3.00, and 11.00." The ALJ then went on to specifically analyze the criteria of four different listings, including, as quoted above, listing 11.02. *See* R. 27–28. By identifying listing 11.02 by name, explaining that he relied on Dr. Ezike's opinion that no listing was met or medically equaled, and noting that the record did not establish the elements of 11.02, the ALJ satisfied his minimal duty at step three, as explained by the Seventh Circuit in *Jeske*.

---

[2] "For a claimant to qualify for benefits by showing that [her] unlisted impairment . . . is 'equivalent' to a listed impairment, [she] must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990); *see also* 20 C.F.R. § 404.1526(b)(2) ("If you have an impairment(s) that is not described in appendix 1, we will compare your findings with those for closely analogous listed impairments."). Here, the most similar listed impairment, listing 11.02(A), requires "[g]eneralized tonic-clonic seizures [or in this case migraines] . . . occurring at least once a month for at least 3 consecutive months . . . despite adherence to prescribed treatment." 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02(A).

Nowak nevertheless argues that Dr. Ezike's opinion does not provide substantial evidence in support of the ALJ's step-three finding because "Dr. Ezike is an external medicine doctor who has never treated, nor had any contact with Nowak"; because Dr. Ezike's "understanding of SSA's policies is . . . unclear"; and because "Dr. Ezike's familiarity with Nowak's claim evidence is suspect." *See* ECF No. 19 at 1–5. Again, I disagree. First, Nowak's suggestion that a non-examining medical expert's opinion cannot support an ALJ's step-three finding is directly contrary to binding Seventh Circuit authority. *See Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (finding that "[t]he ALJ may properly rely upon the opinion of [state agency] medical experts" in determining that a claimant's impairments do not meet or equal a listing.)

Second, Dr. Ezike's testimony demonstrated sufficient understanding of the SSA's step-three policies. After outlining Nowak's medically determinable impairments, Dr. Ezike affirmed that he was familiar with the Commissioner's medical listings. R. 51. His testimony continued as follows:

> [ALJ] And based upon your experience, your education, training and review of the medical evidence, do you have an opinion as to whether or not the claimant's medical impairments, individually or in combination, meet or equal any of those listings?
>
> [Dr. Ezike] Well, your honor, the claimant does not meet, I think, any one listing.
>
> [ALJ] And what listings did you consider?
>
> [Dr. Ezike] Your honor, I considered listing—oh, the musculoskeletal listing of 1.00. I also considered the respiratory [INAUDIBLE] of 3.00.
>
> [ALJ] All right. Now how about the migraine headaches, is there any equivalent or, under the listings, anything that would—
>
> [Dr. Ezike] No, but I do look at central nervous system in 11.00 [phonetic] and I didn't see any equivalent.

10

R. 52. Dr. Ezike appeared to have some connection issues during the remote hearing, so Nowak's attorney at the time asked the ALJ if he could repeat his testimony about the listings. The following exchange then occurred:

> ALJ: Right. You said she did not meet any of the listings, correct?
>
> [Dr. Ezike]: Yes, your honor.
>
> ALJ: And she didn't equal any of the listings?
>
> [Dr. Ezike]: No, your honor.
>
> ATTY: Okay.
>
> ALJ: Okay, and you considered the ones that are 1.00, the musculoskeletal? You considered the respiratory, 3.00, correct?
>
> [Dr. Ezike]: Yes, your honor.
>
> ALJ: And then you said the central nervous system? Which listing is that?
>
> [Dr. Ezike]: And that one was 11.
>
> ALJ: 11.00?
>
> [Dr. Ezike]: Yes.
>
> ATTY: Okay. Thank you, your honor.
>
> ALJ: Okay.
>
> [ALJ]: And that would be for her migraines?
>
> [Dr. Ezike]: Yes, your honor.

R. 55–56.

Nowak makes much of the fact that Dr. Ezike had to be "prompted" by the ALJ for his opinion as to whether Nowak's migraines were medically equivalent to any listing, but the testimony actually reflects a deft understanding of the step-three process. Dr. Ezike first

11

considered whether any of Nowak's impairments met a listed impairment. Then, recognizing that there is no listed impairment for headaches, he considered Nowak's migraines under the medical-equivalence framework. The ALJ's intervening question does not establish that Dr. Ezike was unaware of SSA policy concerning medical equivalence vis-à-vis headaches or that Dr. Ezike never truly performed the medical-equivalence evaluation. Nowak also criticizes Dr. Ezike for noting section 11.00 without identifying a specific listing within that section. But this too shows an understanding of SSA policy, as someone unfamiliar with those policies would not intuitively think to consider migraines under that section. And it can be inferred from Dr. Ezike's testimony that he "didn't see *any* equivalent" in that section that he considered listing 11.02.

Finally, Nowak has not demonstrated that Dr. Ezike lacked a familiarity with the record such that his opinion cannot support the ALJ's step-three finding. Although Dr. Ezike did not identify any specific evidence from the record that informed his opinion, he did acknowledge at least three times that he had reviewed the medical records, and nothing in the record calls into question this testimony. *See* R. 51 ("Well, according to the medical records that I reviewed . . . "); R. 52 (affirming that his step-three opinion was based on, among other things, his "review of the medical evidence"); R. 56 (affirming that the records reflected the frequency or intensity of Nowak's migraines and the limitations resulting therefrom). Nowak correctly points out that Dr. Ezike testified before she did, but her testimony concerning the frequency and intensity of her migraines was consistent with other evidence in the record and thus likely would not have changed Dr. Ezike's listing opinion. Likewise, the fact that Dr. Ezike did not initially identify what Nowak believes is an "obvious" limitation relating to her chronic cough—that is, the need to avoid certain exposure to pulmonary irritants and dust—

12

does not cast doubt upon Dr. Ezike's listing testimony. Indeed, the ALJ noted that neither he nor Dr. Ezike had access to Nowak's most recent pulmonologist records. *See* R. 56.

Accordingly, Dr. Ezike's testimony constitutes substantial evidence in support of the ALJ's finding that Nowak's migraine headache impairment was not presumptively disabling, and Nowak has not demonstrated that the ALJ committed reversible error in reaching that finding.

## II.     The ALJ's Evaluation of Nowak's Alleged Symptoms

ALJs use a two-step process for evaluating a claimant's impairment-related symptoms. *See* Social Security Ruling 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016). First, the ALJ must "determine whether the individual has a medically determinable impairment (MDI) that could reasonably be expected to produce the individual's alleged symptoms." *Id.* at *5. Second, the ALJ must "evaluate the intensity and persistence of an individual's symptoms such as pain and determine the extent to which an individual's symptoms limit his or her ability to perform work-related activities." *Id.* at *9. "In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *9–10.

Reviewing courts "will overturn an ALJ's decision to discredit a claimant's alleged symptoms only if the decision is 'patently wrong,' meaning it lacks explanation or support." *Cullinan v. Berryhill*, 878 F.3d 598, 603 (7th Cir. 2017) (quoting *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). "A credibility determination lacks support when it relies on inferences

13

that are not logically based on specific findings and evidence." *Id.* "In drawing its conclusions, the ALJ must 'explain her decision in such a way that allows [a reviewing court] to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record.'" *Murphy*, 759 F.3d at 816 (quoting *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011)).

Here, Nowak challenges the ALJ's evaluation of her statements about the intensity, persistence, and limiting effects of her alleged symptoms; specifically, the ALJ found them "inconsistent because the evidence generally does not support the alleged loss of functioning." *See* R. 28–31. The ALJ identified eight inconsistencies. First, the ALJ noted that Nowak claimed she was unable to work due to her chronic cough, but also that she reported the cough resolved on its own. R. 31. Second, in the ALJ's view, Nowak's receipt of short-term and long-term disability benefits since her alleged onset date suggested that she did not have "motivation to look for new employment." *Id.* Third, the ALJ thought Nowak's claim of being unable to work due to being tired was inconsistent with the record, which showed her levels of sleep to wax and wane. *Id.* Fourth, the ALJ noted that, despite complaining about being tired and having severe migraines, Nowak "is assessed as appearing well-nourished and in no acute distress." *Id.* (citing Ex. 10F, 71 [R. 847]; Ex. 11F, 31 [R. 891]; Ex. 16F, 96 [R. 1067]; Ex. 18F, 5 [R. 1098]).

Fifth, the ALJ acknowledged that although Nowak "alleged frequent, severe headaches where she needs to lie down in a dark and quite room[,] . . . there are no medical opinions to support that the severity/frequency of her headaches are work preclusive and this was not found by the medical expert at the hearing." R. 31. Sixth, the ALJ did not credit Nowak's claim about limitations standing and walking, as the record showed she had strength

and mobility. *Id.* Seventh, the ALJ determined that, despite Nowak's complaints of hand pain, the record did not support any limitation in the use of her upper extremities to handle, finger, or feel. *Id.* Eighth, and finally, according to the ALJ, a sit/stand option was not medically necessary given that she generally ambulated with normal gait; the ALJ did, however, give Nowak the benefit of the doubt by limiting her to sedentary work. *Id.*

Nowak challenges only three of the eight inconsistencies identified by the ALJ—the ones, in her view, that relate to her migraine headaches. *See* ECF No. 14 at 7–9. She first argues that her receipt of long- and short-term disability benefits does not evidence a motivation to stay on disability, given that she had a lengthy work history and earned significantly more money when working than when not. *Id.* at 8. She is partially correct. First, it must be recognized that *any* claimant who considers the possibility of receiving a benefits award might possess a reduced motivation to seek employment, which could put such an award in jeopardy. Thus, the fact that Nowak happens to have some disincentive to find work does not necessarily distinguish her in any material way from the typical claimant. Second, it's a somewhat odd result that a third-party insurer's determination that Nowak is disabled should somehow count *against* her Social Security disability claim—one would think that, if anything, it would tip the scale in her favor. On the other hand, given the real-world context of a claim that relies almost entirely on subjectively reported symptoms, ALJs often rely on such factors in assessing the severity of claimed symptoms. "Plaintiff's receipt of $1,500 a month in long-term disability benefits tends to reduce her incentive to work, and is a reason to discount the credibility of her allegations of disabling symptoms." *Garcia v. Astrue,* No. 12-1030-JWL, 2012 WL 6159972, at *11 (D. Kan. Dec. 11, 2012). *See also Taormina v. Colvin,* No. 5:14-CV-05089-KES, 2015 WL 9592516, at *7 (D. S. D. Dec. 31, 2015) (when claimant

received VA disability benefits, "it was within the ALJ's purview to consider Taormina's potential lack of motivation when examining the credibility of the psychological impairments she describes."); *Kuikka v. Berryhill*, No. 17-CV-374 (HB), 2018 WL 1342482, at *12 (D. Minn. Mar. 15, 2018) (claimant was "working in his art studio, promoting his book, and being supported by VA disability benefits—all of which indicated 'he may not have economic incentive to return to work.'") Accordingly, while it certainly is not a compelling reason for discounting Nowak's statements about the severity of her headaches, it was not reversible error on its own.

Nowak next argues that the ALJ erred in discounting her symptoms because he placed too much weight on her appearance during several medical appointments *See* ECF No. 14 at 8–9. In discounting the severity of Nowak's migraines, the ALJ cited three medical records indicating that Nowak appeared to be in "no acute distress" and one where she appeared "well nourished." R. 31 (citing Ex. 10F, 71; Ex. 11F, 31; Ex. 16F, 96; Ex. 18F, 5) However, the phrase "no acute distress" does not mean that Nowak was actually feeling well during all of those appointments. Far from it. For example, the ALJ cited a September 18, 2018 appointment in which Nowak appeared in "no acute distress," R. 847, but on that day she was presenting to the treatment provider in order to "break her cycle" because she had "been having severe headaches daily for the past 2 weeks," R. 844. The treatment note indicates that "patient's headaches have increased," the location of the pain was bilateral temples and neck, and the daily severity was 7/10, sometimes severe at 10/10, with migraines feeling like "hammering nails in my head" and other headaches feeling tight, like a "vice." *Id.* Moreover, the medications weren't working: "her 4th round of Botox" produced no benefits, and the Toradol IM had stopped working as well. *Id.* She also stated that "there has never been a

rescue medication that has worked for her." *Id.* The provider proposed a treatment plan involving three new drugs: a Medrol dose pack to "break" the two-week migraine, a trial program of Aimovig 70 mg injections, as well as Sumatriptan 6 mg as a rescue medication. R. 848.

The second record cited by the ALJ indicates merely that Nowak was "Well developed, Well nourished." R. 891. It is unclear what inference, if any, may be drawn from the fact that she was well nourished, and so it does not support any conclusion regarding the severity of Nowak's symptoms. The third record the ALJ cited comes from a March 20, 2019 office visit in which Nowak again appeared in "no acute distress." R. 1067. However, as with her September 2018 appointment, the treatment notes tell a different story. For example, her headaches were "status quo" (compared to the previous September visit) despite having tried Aimovig 70 mg. She described the pain as a sharp shooting pain that was constant and at a 7/10 level, sometimes up to "10+" out of 10, an average of 18 days out of the last 30. R. 1063. Pain was throbbing, vice-like. The medications she had tried did not seem to work. The plan was to obtain authorization for a bilateral occipital nerve block, increase Aimovig injections from 70 mg to 140 mg, and start Tizanidine 4 mg daily. R. 1068. For rescue, she would try Axert 12.5 mg.

The same record also indicates that Nowak was assessed a "HIT-6 score" of 68. R. 1063. HIT, which stands for Headache Impact Test, "was designed to provide a global measure of adverse headache impact and was developed to use in screening and monitoring patients with headaches in both clinical practice and research." *See* National Institutes of Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3057423/, last checked April 2, 2021.

Case 2:20-cv-01088-SCD   Filed 04/06/21   Page 17 of 22   Document 20

HIT-6 scores range from 36 to 78, with anything over 60 indicating a "severe impact" on the patient. *Id.*

The final record cited by the ALJ again indicates that Nowak appeared in "no acute distress," but this was at an oncology follow-up appointment for her prior breast cancer diagnosis. R. 1098. It is unclear why we should draw any inference about headaches from an oncology provider's assessment. The subject of headaches likely never came up.

ALJs faced with assessing the severity of subjective symptoms are not bound to take the claimant's statements at face value. 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled.") Instead, ALJs have several tools in their toolkit. For instance, ALJs sometimes cite a claimant's conservative treatment as evidence that the severity of symptoms was less than claimed. *Betty J. v. Saul,* No. 18 C 5457, 2020 WL 2557348, at *7 (N.D. Ill. May 20, 2020) Here, however, the treatment was anything but conservative: providers were prescribing a smorgasbord of prescription medications, including injections and nerve blocks, to try to combat Nowak's headaches. In addition to the drugs recounted above, she was taking Effexor, propranolol, and chlorzoxazone. R. 820. Earlier treatments had included Maxalt, Relpax, Zomig PO, Cambia, Migranal, and Embrace. *Id.* The extent her care providers went to try to alleviate Nowak's headaches suggests that *they* believed her symptoms were severe and frequent. *Merriman v. Berryhill,* No. 16 CV 50073, 2017 WL 2345551, at *6 (N.D. Ill. May 30, 2017) ("Plaintiff took numerous medications for pain and other symptoms, including (among others) Savella, Amitriptyline, Lyrica, Tramadol, Celexa, Cymbalta, and Gabapentin. These were not over-the-counter medications, and there is no evidence that doctors viewed them as conservative treatments.")

18

When discounting claimants' subjectively reported symptoms, ALJs also sometimes remark that the claimant receives relief from one or more drugs. *See, e.g., Walker v. Berryhill,* No. 2:17-CV-02442, 2018 WL 3015790, at *12 (S.D. W. Va. Apr. 25, 2018) ("Claimant reported having nine severe headaches per month for which he took Imitrex, yet conceded that the medication provided significant relief for his symptoms.") Here, however, the record indicates that Nowak was *not* receiving relief from any of her treatments—in fact, that's why she had tried so many different medications.

Finally, ALJs sometimes note that a claimant's daily activities belie the severity of the symptoms reported. A claimant who is able to participate in more than minimal daily activities might not be experiencing symptoms as severely or frequently as claimed. *See, e.g., John B. v. Saul,* No. 2-18-cv-00223-JVB-JEM, 2019 WL 4233744, at *3 (N.D. Ind. Sept. 5, 2019) (ALJ properly noted that the plaintiff worked a part-time job). Here, however, the plaintiff reported very minimal daily activities. She stated that she woke around 10:30 a.m., grabbed some cereal, let the dog out, watched television, prepared a meal or two along the way, and then retired to bed by 11:00 p.m. R. 73. She used to read "all the time" but stopped because it could trigger a worse headache. R. 72.

In sum, nothing in the record jumps out as a persuasive reason to discount Nowak's statements about her migraines and other headaches. The records the ALJ did cite suggest a patient who suffers from almost daily headaches and migraines that range in severity from 7 to 10 out of 10. Her HIT-6 score of 68 suggests at a minimum that the treatment providers thought these headaches had a severe impact on Nowak's life. The substance of these records indicates that the plaintiff was in a great deal of distress, albeit not of an "acute" nature.

In fact, it's questionable whether any negative inference may be drawn from generic remarks that a patient is in "no acute distress," particularly when the appointment involves a *chronic* condition like headaches. "To physicians, 'No Acute Distress' means that your patient will probably not become unstable in the next 5 minutes." *Wanserski v. Colvin*, No. 1:14-CV-1033-DKL-JMS, 2015 WL 5692521, at *7 (S.D. Ind. Sept. 28, 2015).

> Without an explanation of what the recording medical professionals meant by "no acute distress," it cannot be simply assumed, as the ALJ did, that they meant that Ms. Wanserski did not experience migraine-headache pain to the degree that she alleged. Further, although Ms. Wanserski alleged at times that she has constant headaches, she did not allege that they are always of disabling severity; thus, the fact that she was not in apparent acute distress at the times of certain examinations is insubstantial evidence that she never experiences the degree of symptoms that she alleged.

*Id.* Other courts have recently made similar observations. *See, e.g., Mitchell v. Saul*, No. 2:18-cv-01501-GMN-WGC, 2020 WL 1017907, at *7 (D. Nev. Feb. 13, 2020), report and recommendation adopted *sub nom. Mitchell v. Berryhill*, No. 2:18-cv-01501-GMN-WGC, 2020 WL 1017899 (D. Nev. Feb. 28, 2020) ("notations that Plaintiff was healthy 'appearing' and in no 'acute' distress do not distract from the findings regarding Plaintiff's chronic conditions."); *Richard F. v. Comm'r of Soc. Sec.*, No. C19-5220 JCC, 2019 WL 6713375, at *7 (W. D. Wash. Dec. 10, 2019) ("Clinical findings of 'no acute distress' do not undermine Plaintiff's testimony. . . . 'Acute' means 'of recent or sudden onset; contrasted with chronic.'"); *Toni D. v. Saul,* No. 3:19-CV-820-SI, 2020 WL 1923161, at *6 (D. Or. Apr. 21, 2020) ("the generic chart note of 'no acute distress' is not a clear and convincing reason to discount Plaintiff's symptom testimony.") For these additional reasons, the fact that Nowak was not in acute distress is not a reasonable ground to discount the severity of her headaches.

Finally, Nowak takes issue with the ALJ's reliance on the lack of a medical opinion to substantiate her claim of needing to lie down in a dark, quiet room, arguing that it is the ALJ,

20

not the medical experts, who assess her RFC. *See* ECF No. 14 at 9. Nowak correctly points

out that it is the ALJ's duty to construct a claimant's RFC. *See* SSR 96-8p, 1996 SSR LEXIS

5 (July 2, 1996). It's true that there is no medical opinion directing her to lie down in a dark

room, but the medical records routinely note that "[m]oderating factors include sleeping, dark

room, quiet." R. 795, 819, 844. It's unclear if lying in a dark room was recommended by

medical professionals or was something Nowak had tried on her own. If the former, then the

ALJ was wrong. If the latter, then there would have been little value in a medical opinion

recommending to Nowak that she do something she was already doing. Thus, even if it's true

that there is no medical opinion specifically recommending lying down in a dark room, that

doesn't seem a particularly cogent reason for discounting the severity of her symptoms.

In sum, while it's possible that Nowak's headaches are less severe than she alleged, the

ALJ's stated reasons and the evidence he cited do not support that conclusion. If the severity

and frequency of her headaches is fully or mostly credited, it would likely follow that she

would need to miss several days of work per month, precluding full-time employment.

Because the ALJ's conclusions underlie both his step-four and step-five findings, the case will

be remanded for further proceedings.[3]

## CONCLUSION

For all the foregoing reasons, I find that the ALJ's decision is not supported by

substantial evidence. The Commissioner's decision is **REVERSED**, and this action is

**REMANDED** pursuant to sentence four of section 205(g) of the Social Security Act, 42

---

[3] Because I find that the ALJ erred in evaluating Nowak's alleged migraine symptoms, I do not need to specifically address Nowak's related argument, *see* ECF No. 14 at 5–7, that the ALJ's RFC assessment failed to account for all limitations stemming from her migraine headache impairment.

21

U.S.C. § 405(g), for further proceedings consistent with this decision. The clerk of court shall enter judgment accordingly.

SO ORDERED this 6th day of April, 2021.

STEPHEN C. DRIES
United States Magistrate Judge